[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
The parties were married on February 17, 1990, in Newtown, Connecticut. Both have resided for the statutory period within the State. They share two children, Kieren, born July 7, 1990, and Meghan, born February 2, 1992. The parties were each twenty-five years of age at the time of the marriage, and are currently thirty-one years of age.
After hearing the evidence, the court can find that the marriage has irretrievably broken down, and enters a decree dissolving the marriage. The court can further ratify the stipulation of the parties, with respect to their continuing to share joint custody of their daughters. The parties have been able to work through any issues with respect to their children. The parties were ordered to take the Parenting Education Program on March 6, 1995, and the file does not reflect their completion of that program. The court will require them to report to the court that they have completed the program by October 1, 1995.
The parties met in 1989, and were admitted to Mattatuck Community College in the Nursing Program. They moved into an apartment in Waterbury in May of 1989. She had some furniture, and they paid their own outstanding bills, while sharing the common bills of the apartment.
He was seeing another girlfriend prior to the time of their cohabitation. They were engaged at the end of August, 1989. She had had some upheaval in her family, so they asked her parents permission, and planned to marry in August of 1990. In November of 1989, she learned that she was pregnant. Both were in Nursing school at that time. She claimed that he was unhappy with the fact of the pregnancy, that he had said that their plans that now were ruined. She gave him the option of ending the engagement, and indicated that she would have the child without the marriage.
He had a conversation with his father, and his attitude about the pregnancy changed completely. She testified that he apologized and was committed to their starting a family. The pregnancy was difficult. She was quite ill, and missed many classes. The pregnancy occasioned a February wedding.
At the time of the marriage, they had outstanding credit card debt, and they owed a Sears bill for a washer and dryer. CT Page 8144 The gifts of cash from the wedding was used to pay debt. They did not take a honeymoon until Spring break, when they went to England to visit with his mother, who had not been able to come to the wedding.
When they returned, she was asked to withdraw from the Nursing program, because of absences. He was able to stay in the program. She testified that she felt animosity concerning the school's position in allowing him to remain, even though their absences were approximately the same. She testified that it did affect their relationship.
Her health was not good through the pregnancy. She was required to receive IV fluids just prior to her delivery, which occurred six (6) weeks early. Kieren weighed Four and one-half pounds, had lung difficulty, and jaundice. Kieren remained in the hospital for about one week after the plaintiff's discharge. She testified that he was very happy about the birth, and that he had written a poem about the delivery. When she came home from the hospital, she was on her own with babycare.
They determined long-term goals, that would allow him to finish school to assure family security, and thereafter allow her to renew her education. She testified that he demanded that she do all the childcare, housework, as well as maintain a job. She wanted to go back to work, and felt the family needed the additional income. He would take care of the child when she was at work. He would not want to watch them on his day off, and she was often required to hire a babysitter if she was at work. Their priorities changed, she felt. She said he did not want to give up going out with his friends.
He was in the military, and when the conflict with Iraq began, he was told by his unit to prepare to be called up. They discussed that he should volunteer to get a safer assignment. It was very stressful, exacerbating her asthma. She also had her gall bladder out. At Christmas time, he was told he was leaving in early January. She gave him a party for all their friends. He left the party with three of the female nursing students who had been invited to the party. He called later to say that he was not returning home. She was humiliated, and hurt. She called him at one of those guests' house, and she insisted that he get on phone. Her parents were called to help them sort this out. CT Page 8145
He was away for approximately five months. In January he was in the country in training for Desert Storm, she had her gall bladder surgery, so she lived with her parents. She received some payment from the military, but it took six to eight weeks before she received any funds. On cross-examination, she testified that she used the funds which were automatically deposited to pay the family bills the best she could. She testified that she made no major purchases except for a stereo, which she bought just prior to his return. She currently has that.
She took a leave of absence from her job at the ambulance while he was away, and exchanged letters with him while he was gone. She returned alone to the apartment a couple of weeks before he returned in May of 1991. She testified that their reunion at Fort Dix was wonderful. He was given a 24 hour leave, and they spent time together in a hotel, and spent time with the friends who had accompanied her to New Jersey. Shortly thereafter, she learned that she was again pregnant.
She thought she should terminate the pregnancy. The timing was terrible, with a ten month old at home. He needed to finish school, and their finances were not good. He wanted her to keep the baby, because she was conceived at such a happy time in their lives. Later, he said he only said that because he thought that was what she wanted to hear, but that he did not want the child. When he returned he worked, while she suffered through another pregnancy. She kept the baby to term, but she had a difficult time.
According to her testimony, she was still expected "to do her job." She was very ill, but it became an annoyance to him that their lives were so disrupted by her illness. When his father came to see them at Christmas, they all smoked in her presence, requiring a trip to the Emergency Room because of her asthma. She testified that it bothered her that he never stood up to his parents to defend her.
Their second child was born, and the defendant was in school and working forty hours so there was not alot of time for him to help with the children. It was not an issue until the plaintiff wanted to go back to work. She testified that she had severe post-partum depression, and that he did intervene and help. In May of 1992, she was taking anti-depressants CT Page 8146 for the post-partum condition, and antibiotics for a respiratory infection and asthma. She overdosed one day, and was in intensive care for five days. He was only months away from graduation, and she was advised to go back to work to assist with her depression.
When she did go back to work, it became an issue again, as to how he would spent his days off, and who would do the childcare if she was at work. She claimed that her only social life was work, and that he still wanted to go out with friends. In the summer of 1992, he graduated, and had a job at Waterbury Hospital. He did not like that job, because he wanted to do emergency medicine. He explored the DEA and FBI, which was not an idea she was fond of. She still had hopes of going back to school.
In December of 1992, he secured his position in the Emergency Room at the Veterans Hospital. She was working thirty-two hours per week. Their finances did not seem to improve, however, which she claimed required them to continue to borrow money from her parents. The family had a lapse in medical insurance coverage when he changed employment. Waterbury Hospital allowed COBRA coverage, but there was a conflict between the parties concerning whether or not to pay the premium. They spent money received from a bad food claim settled with Red Lobster to buy a computer rather than to pay the premium on medical benefits. He claimed, she said, that he wanted a computer to pay the bills, because she was not able to balance their check book well, claiming dyslexia.
During the time they were without medical insurance, she was hospitalized for asthma and incurred bills which totaled Two Thousand, Nine Hundred, Fourteen and 70/100 ($2,914.70) Dollars. There are current collection cases pending to secure repayment of those sums.
Approaching their third anniversary, their marriage was falling apart. She was miserable, and tired. He frequently went out. When he was home, he would receive a late night call, and often went out late at night. He worked the night of their third anniversary on overtime, and the night after, when they had dinner with the children, he had dinner, left, and stayed out all night. It began a pattern of his staying out all night. She did not believe many of the excuses he gave about his lateness in arriving home after she had check CT Page 8147 when he had left from work.
He worked the 3 p. m. to 11 p. m. shift, and any overtime. She sometimes had to call work that she was unable to be there because he did not come home by the time she had to go to work at 7 a.m. She would also be concerned that he would return drunk, and that she would not be able to leave the children with them. She asked him to leave many times, but he refused, saying he had no where to go, and that it was his house, and she should leave.
The unhappiness in the marriage caused health problems to her, including problems with her feet. She had several stress-related conditions, including asthma, that were a concern. He would leave for a period of time, return to sleep on the couch.
In March of 1993, their medical insurance commenced, but only after she had to get involved to make him file the paperwork. She claimed that he often ignored issues, thinking that they would go away. Mid 1993, she testified that he was not nice to her, calling her names, which appear of record but will not be repeated herein, and humiliating her. The handgun kept in the house would be moved around the house, and found loaded. A neighbor who had guns unloaded it for her, and she found it loaded the next day. She found him loading the gun in front of the children, and she was very concerned and upset. She was also concerned about his unhappiness, and what he might do to himself. She had her parents remove the gun from the home, but he demanded it so many times, once in front of one of the children.
She claims that the gun should be sold as part of the orders of the court, because she feels he is irresponsible with it. On cross-examination, she testified that she did not know why he moved the gun into the bathroom, and when it was suggested that perhaps there was a higher shelf, she declined to opine.
In April of 1993, he came home distraught because the mother of one of his co-workers had died. She thought it was unusual that he would act this way. It was Melissa's (Ms. Papandrea) mother, and she only later understood. Late in May, he came home in tears, woke her up, and he sat there and cried. She just went back to bed. In April and May, she CT Page 8148 continued to have sex with him, but it was not fulfilling, but rather perfunctory. She felt cheap, gained weight, and lost self-esteem.
He made some contribution to the family finances, and finally left in July. When he left, some of the furniture and furnishings were taken, along with the computer. She testified that she gave him whatever he needed. She did not like the children staying at his Cheshire apartment because it was not well-maintained. He had no place for the children to sleep. Thereafter, he moved in with Ms. Papandrea.
When the parties separated, she had been employed at Medstar, but she was fired due to her absences. Some were medically related, others were due to her inability to secure childcare. She collected unemployment, and had part-time work. She is currently employed at three part-time employments as a paramedic, dispatcher, and instructor in those areas. On cross-examination, she agreed that her dispatcher job was two days per week, extended hours.
In May of 1994, Meghan became sick because she took her mother's asthma medication. The plaintiff rushed her to the hospital by ambulance. She called the defendant who came directly to the hospital. She had to have her stomach pumped hourly, and that she would be critical. The defendant left and went to work, but he did not have to be at work until eleven. He had left the hospital at six or six-thirty.
She was evicted around October of 1994. She moved the weekend prior to trial, to Oakville. She is paying Six Hundred ($600.00) Dollars per month, and wants to use the old security deposit of Five Hundred, Sixty ($560.00) Dollars to repay her parents for the loan of the new security deposit.
Her day care cost will be Two Hundred ($200.00) Dollars per week, because she is working forty hours per week. She intends to complete her nursing degree, but cannot do that at Mattatuck because it is a day program. She feels that she will be an R.N. within three (3) years.
On cross-examination, she testified that the marriage broke down on their third anniversary, February 17, 1993, when he failed to come home. She conceeded that they had verbally abusive arguments. She stated that they each knew what to say CT Page 8149 to hurt each other. She believed that their arguments became progressively worst after the birth of their second child, "when I was doing everything and he was doing nothing." She claimed that that was a time when he was not in school. When asked if she continually degraded him, she denied that allegation.
She will receive benefits as a paramedic with the Danbury Ambulance, and has provided that available life insurance will be designated with the children as irrevocable beneficiaries. The policy will be available at $100,000.00.
The plaintiff called a witness from the place of defendant's employment. The court interrupted the taking of evidence for the purposes of the attorneys stipulating to the introduction of time records, a copy of which became Plaintiff's Exhibit 3.
The plaintiff called her mother, Arlene O'Brien, to testify concerning her knowledge of his employment and statements made to her concerning his goals for the future. She testified that the day after the "going away" party, prior to his departure for Desert Storm, he appeared to be unaware of why anyone would think it odd that he had slept "in another woman's home" the night before he left.
She testified that she constantly had to encourage the defendant to finish school, and that she and her husband would continue to help them financially, so that he could complete school and support his family in the future. The understanding was that after he finished and was established in his employment that the plaintiff would then reenter school, and proceed to secure her degree.
Mrs. O'Brien testified concerning loans over time. The parties stipulated that the plaintiff's parents had been quite generous to them. The checks which demonstrate how those funds were dispersed to this young couple were Plaintiff's Exhibit 4. Some were made payable to the defendant, but the bulk are made payable to the plaintiff. On cross-examination, the witness explained the educational expenses of their daughter that she and her husband had provided for her.
The witness, who is a nurse, talked to the defendant concerning the jobs available as a nurse. He is currently CT Page 8150 working three twelve hour days. They discussed the earning potential with extra income coming from additional shifts, or per diem work. The witness claimed that she knew he did such extra work after he had left the home, but could not describe when or how often.
The plaintiff called Melissa Papandrea, of Wallingford. She is a Registered Nurse at the same hospital with the defendant. She met him as a co-worker in January of 1993. She began to socialize with him in groups after work shortly thereafter. Later, their relationship became intimate, in the summer of 1994. The defendant rented a house together with this witness and one other person. When they began to reside together, they were not intimate. She is currently purchasing a home, where she will live with her daughter from her marriage, which was dissolved in July of 1993, and the defendant, who will have his children at that home on the visitation schedule that has been agreed to by the parties.
The defendant testified on his own behalf. He has as his only place of employment, the Veterans' Memorial Medical Center in Meriden. He did work extra shifts but did not feel comfortable working at the long term care facility. He reaffirmed his educational history, including his premed in Texas, where he did not do terribly well. He worked as a paramedic while still in Europe. He testified that he did not adjust well to his college experience because it was the first time he had been away from his parents. He had been raised all over the world, because his father was in the Air Force and as a civilian with the Defense Department.
He filed a cross-complaint, and could not say with specificity when the marriage broke down. He said they had a very tumultuous relationship, and felt their relationship did not have much of a chance. They married, were busy with school and work, then children came too rapidly, not allowing them to truely develop a relationship. The intensity of their arguments after January of 1993 resulted in his belief that there was nothing more that they could do to restore their relationship. He recalled that she frequently told him how miserable she was.
He described his employment history prior to his current employment, which was not long. He became disillusioned in his job at Waterbury Hospital. He had wanted to do Emergency CT Page 8151 work, which was more of a challenge. He was beginning his career at a time of industry downsizing. It was at that time that he looked into federal law enforcement jobs. He continued working as a nurse, except for one brief period of time between his employment at Waterbury Hospital and Veterans' Memorial. He maintains his work as a Nurse to today's date.
He described the opportunities for overtime at his new employment. During the summer of 1993, which he claimed was unique, vacation time was turned down, created a grievance process, resulting in everyone who wanted vacation to get it, and allowing him to have overtime. Otherwise, he was new and did not get much overtime. The veterans hospital merged with Meriden-Wallingford Hospital becoming the current entity by which he is employed. He claimed that he worked overtime that was available, and fit his schedule when he had the children. He claimed that he worked as much as he could because he is barely making it as it is.
He conceeded on direct that he had never been good with finances, and asked Kimberly to manage the family monies. He considered himself to be the major earner. Kimberly paid the family bills. At the time he left the marital home, he took out a loan to pay marital bills. The loan was in the amount of Six Thousand ($6,000.00) Dollars, so that he would not leave Kimberly with debts she was unable to pay. He claimed that she may have debts left over, but they were small.
He testified that he knew his wife was unhappy, because she told him. She was not happy with his earning capacity, his behaviors, and she would not take responsibility for any of the difficulties in the marriage. He was not specific in any of these claims.
He agreed that they had violently verbal arguments and that those arguments did disintegrate into vulgarity. He agreed that he stayed out over night with friends, and that it was irresponsible, but that he did that when he had "very little to come home to." The court was dismayed by this testimony, for he did have two children to come home to, even if the state of his marriage was poor. He claimed that he asked her to come out, but she declined always, and so he stopped asking. Concerning their lack of social life, he seemed to be unaware of, and did not mention, the presence of CT Page 8152 two small children entering their lives in a short period of time.
The defendant asked that the gun be sold and that he keep the money, because he owned the gun before the marriage. While his request in his proposed orders was to retain it, he would now like to sell it, saying it had no intrinsic value to him. He claimed that he had only fired the gun at a range, and had acted responsibly with it.
On cross-examination, the plaintiff asked the defendant to view Plaintiff's Exhibit 1, with respect to his claim of income on his financial affidavit. The actual records show an average for the last thirteen weeks of Eight Hundred, Nineteen and 61/100 ($819.61) Dollars.
He testified that he worked so that he could have time to spend time with the children. He was examined concerning whether, in fact, he had worked while the children were staying with him. The court opined that the court believes that parents who need to support their children must work to do so, and that children then are taught the important lesson that life entails work, and that it is a normal function of adulthood, especially an adulthood which has the responsibility of raising, nurturing, and supporting children.
The defendant was questioned as to his contribution to the home that he rents with others, and the figures on his financial affidavit. Some of the expenses were overstated. The defendant and Ms. Papandrea are about to move into a home she is purchasing, and the expenses will change. He lists more debt today, indicating that he is not a good record-keeper, and that when he prepared his earlier financial affidavit, he probably had the debt, but did not "dig deep enough" to find it and list it.
The debt of Six Thousand ($6,000.00) Dollars was the loan he took out to pay debt. The Waterbury Hospital loan was in his name, but was to pay off articles that they purchased for them as a couple, and later as a family. He also provided some post-separation family support from those funds.
He currently drives a car belonging to Ms. Papandrea. He was unable to meet the payments on the car he purchased at the time of the separation, which he sold for the price of the CT Page 8153 note plus a contribution from his 1994 income tax return.
The court has had the opportunity to assess the evidence aduced at trial, and to apply the statutory criteria. Based upon the evidence, the court can find that the defendant's conduct was the major factor in the breakdown of this marriage. The court finds that the lack of mature judgment by the parties, which occasioned a precipitous birth, made their marriage difficult from the start, but that the defendant's unwillingness to act responsibly to his wife and children caused the breakdown of the marriage. He evidenced an emotional committment to another woman, at the very least, at the time when the parties seem to agree that their marriage was ending. Had Ms. Papendrea not been in the picture, his taking leave of his family would not have been so easy, and perhaps they would have awakened to their responsibilities before the marriage was totally irreconcilable. While the defendant bears most of the responsibility for the breakdown of this marriage, the plaintiff must also understand that she participated with him in the decision to have children so early in their relationship.
The court also finds that the parties will be able to maximize their ability to support their children into the future if the plaintiff has the ability to complete her nursing degree, as she has credibly testified she desires to do. While that will have a short-term impact on the defendant's income, the long-term result will be heightened resources for the children. Under the circumstances described during testimony which the court credits, the long-term plans for this family will actually be possible.
1. CHILD SUPPORT. The court earlier ratified the agreement of the parties with respect to the custody and visitation of the children. The court has assessed the financial affidavits of the parties and their Uniform Support Guidelines worksheets. The defendant is ordered to pay Two Hundred ($200.00) Dollars per week as child support. He is also ordered to maintain medical insurance for the minor children as available to him through the course of his employment. If he has further benefits, such as dental insurance, he shall also cover the children with that benefit. Until the plaintiff concludes her education, he shall pay seventy-five (75%)percent of the unreimbursed health-related expenses for the children, and the plaintiff shall pay the CT Page 8154 balance. After she concludes her education, the parties shall share those unreimbursed health-related expenses. The provisions of Conn. Gen. Stat. Sec. 46b-84 (a) and ((d) shall apply.
The defendant is further ordered to disclose proof of his earning every six (6) months until further order of the court.
2. ALIMONY. The defendant shall pay the plaintiff the sum of Fifty ($50.00) Dollars per week as alimony, until she completes her nursing education, or for a period of three (3) years, whichever first occurs. The time period for that payment shall not be modifiable, but the amount may be.
3. INSURANCE. As the parties have agreed, they will continue their life insurance policies, currently One Hundred Thousand ($100,000.00) Dollars each, and name the children as irrevocable primary beneficiaries on those policies.
4. TAX DEDUCTIONS. The defendant shall have both children as tax deductions during the period that he is obligated to pay alimony to the plaintiff. Thereafter, the parties shall share the deductions, the plaintiff having Megan, and the defendant having Kieren.
5. PERSONAL PROPERTY. The plaintiff shall retain the security deposit from the marital property, which she shall receive and pay over to her parents as repayment, or contribution toward repayment, of the current security deposit they paid on her behalf for the current apartment she shares with the children. The defendant is being housed by Ms. Papandrea.
The defendant shall sell his firearm, a Smith Wesson 5906, and retain any proceeds from that sale.
The parties shall retain the furniture and furnishings currently in their possession.
The parties have agreed to share certain debts, to wit: 1) a debt to Waterbury Hospital in the approximate amount of Two Thousand, Three Hundred Four ($2,304.00) Dollars, 2) a debt to Dr. Sherter in the amount of Three Hundred Fifteen ($315.00) Dollars, and 3) a debt to Pediatric Associates in the amount of Two Hundred, Ninety-five ($295.00) Dollars. All CT Page 8155 other debts listed on their financial affidavits shall be the responsibility of the party listing those debts, including the debt remaining to CenConn Credit Union listed by the defendant. The court finds that the financial help to the parties given by the plaintiff's parents require him to pay that debt. Each of the parties shall be responsible to their respective family members for any loans.
6. ATTORNEY FEES. The court cannot find liquid assets for either party which would warrant an award of attorneys fees. The court did not hear testimony concerning special impediments to settlement which would require the court to assess one party attorneys fees. The case was over-litigated, and the parties refused, even with court help, to make decisions concerning their future as a family, and its financial security. Their need to pay their attorneys fees for their decision to litigate will remain a private matter between the parties and their respective counsel.
Judgment shall enter consistent with this opinion.
Dranginis, J.